# Exhibit D

**BIONPHARMA, INC. vs CORERX, UNC.**
Highly Confidential - AEO          Ajay Damani on 01/18/2023

```
                    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                   UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF NEW YORK
 2

 3     BIONPHARMA, INC.,

 4       Plaintiff,

 5       vs.                        CASE NO. 1:21-cv-10656 JGK

 6     CORERX, INC.,                    Highly Confidential
                                        Attorney's Eyes Only
 7       Defendant.
       _____/
 8
       VIDEOTAPED
 9     DEPOSITION OF:              AJAY DAMANI

10     DATE:                       January 18, 2023

11     TIME:                       1:04 p.m. to 3:20 p.m.

12     LOCATION:                   Via Zoom

13     TAKEN BY:                   Defendants

14     STENOGRAPHER:               Joan L. Gombar,
                                   RMR, RDR, CRR, FPR
15

16

17

18

19

20          Naples Court Reporting & Legal Services
                      2315 Stanford Court
21                        Suite 301
                     Naples, Florida  34112
22                      (239) 316-7733

23               NaplesCourtReporting.com

24

25
```

1      Q.   Do you recall about when that was filed?

2      A.   It was late October, as I recall.

3      Q.   Okay.  How did CoreRx first hear about this

4  lawsuit?

5      A.   We first heard about it when we were served.  We

6  were served the papers at our site in Clearwater.  And we

7  also got an email from Bionpharma informing us.  I think

8  it was the same day, actually, that both events occurred.

9      Q.   Was there any communication between CoreRx and

10  Azurity about patents or patent infringement lawsuit

11  before the date that you were served with the complaint?

12     A.   No.

13     Q.   So no cease and desist letters or emails or

14  anything of that nature?

15     A.   Not that I remember.  Not that I recall.

16     Q.   Okay.  When CoreRx was served with this lawsuit,

17  do you recall what you did next?

18     A.   When we were served the lawsuit, what do you mean

19  what did I do next?

20     Q.   Did you contact anyone at Azurity about the

21  lawsuit?

22     A.   I contacted our board.

23     Q.   Okay.  Do you recall specifically, was it the

24  board as a whole or any individuals?

25     A.   No.  It was -- I don't remember exactly.  It was

1  either Jeff Edwards or Vern Davenport.  I don't remember

2  which board member I contacted.  But I contacted a person

3  so that I could engage with them on what we had just

4  received.

5      Q.   Okay.  What did they tell you to do?

6      A.   Yeah.  So they basically said -- I don't remember

7  exactly what was said, but essentially what was said to me

8  was, we don't get involved in matters relating to our

9  portfolio companies; they operate independently and act

10 independently.

11     Q.   Did they advise you on a course of action in

12 their capacity as board members of CoreRx?

13     A.   No, not that I remember.

14     Q.   Okay.  Did you reach out to anyone at Bionpharma

15 about the lawsuit?

16     A.   I reached out to -- one of our board members was

17 not -- was not a NovaQuest-associated person.

18     Q.   Um-hmm.

19     A.   That person, Jim Gail, he was on the board at

20 Bionpharma.

21     Q.   Um-hmm.

22     A.   So I did reach out to him.

23     Q.   Okay.  Do you recall the substance of that

24 conversation?

25     A.   Yeah.  So the substance of that conversation was

1  7.89 or something around there.

2      Q.   So it was mispriced by more than -- the actual

3  cost was more than double of what it had been previously

4  priced at?

5      A.   Yes.  It was badly mispriced.

6      Q.   Were any of these other products badly mispriced?

7      A.   They were.  All of them.

8      Q.   At this time, in November of 2021, was CoreRx a

9  profitable company?

10     A.   We were.

11     Q.   Was CoreRx making a profit on any of the products

12  that it sold to Bionpharma?

13     A.   I don't recall which ones were and which ones

14  were not, but there was -- there was some that we were

15  making a slight profit on and others that we were not.

16     Q.   Okay.  So after this memorandum of November 19th

17  of 2021, CoreRx notified Bionpharma that it would no

18  longer supply Enalapril; is that right?

19     A.   That's right.

20     Q.   What was the rationale for that communication?

21     A.   The rationale for the communication around

22  stopping to supply Enalapril was that we had entered into

23  a settlement agreement on -- with Azurity regarding their

24  lawsuit against us.

25     Q.   Did you consult any members of CoreRx's board of

1  directors about the terms of that settlement?

2      A.   No.  No, I did not.

3      Q.   So you made the decision on your own, without

4  speaking to your board, to settle that case?

5      A.   I made the decision with my legal counsel at the

6  time to settle that case.

7      Q.   And, as you testified earlier, you didn't

8  inform -- you informed the board about the case, but

9  sought no guidance about what to do about it; is that

10  right?

11     A.   Well, as I said, I asked for guidance, and the

12  message back from many of our board -- from the board

13  member who was responsible on the NovaQuest side, that

14  they would not get involved.  And then the guidance I got

15  from Jim Gail was, seek counsel, which I did.

16     Q.   Did you ever consider presenting the options of

17  whether to settle the case or not to the board as a whole?

18     A.   No, I did not.

19     Q.   Why not?

20     A.   Well, frankly, there was too many conflicts.

21     Q.   In your determination?

22     A.   In my determination.

23     Q.   Do you consider Azurity's case against CoreRx to

24  be a threat to CoreRx?

25     A.   My assessment was that Azurity's case against

1  CoreRx was an existential threat to CoreRx.

2     Q.    And you took it upon yourself to deal with that

3  case as you saw fit with no additional guidance or help?

4     A.    Well, as I said, I did have help from a legal

5  counsel.

6     Q.    Okay.  Did you speak to anyone affiliated with

7  Azurity about the terms of that settlement agreement?

8     A.    Well, we negotiated the settlement agreement with

9  Azurity.  Our lawyers primarily took the lead in

10  negotiating that.

11     Q.    I was asking if you, as a CEO of CoreRx, spoke

12  with anyone at Azurity about the settlement agreement.

13     A.    I don't remember -- I don't remember honestly,

14  but there were many calls at the time between all parties,

15  including legal counsel on both sides.

16     Q.    Did you speak to anyone at Bionpharma about the

17  possibility of settling the case with Azurity?

18     A.    As I recall, we -- well, I do know that we were

19  trying to work out a deal with both parties at the same

20  time as part of the negotiation.  So we were trying to

21  reach a settlement and an agreement with Bion to see how

22  we would handle this case, and we were trying to handle --

23  we were trying to reach an agreement with Azurity.

24          And as part of that negotiating contact, we told

25  each side that we were working with the other and that we

 1   whether you had authority to enter settlement agreements

 2   generally?

 3       A.   I don't remember doing that, no.

 4       Q.   What's the basis for your understanding that you

 5   had corporate power and authority to execute and deliver

 6   the agreement?

 7       A.   Well, I was the CEO.  I am the CEO.  So I assume

 8   that I have the authority to execute this document.

 9       Q.   But you never checked if the company bylaws

10   required board approval for that kind of action?

11       A.   I don't believe I did, no.

12       Q.   Okay.  What kind of actions would you believe

13   require board approval on your part?

14       A.   Any type of action -- in my opinion, any type of

15   action that would have a material impact on profitability

16   or risk.

17       Q.   You didn't believe that by signing this

18   settlement agreement impacted CoreRx's risk?

19       A.   In this instance I did, but our board members

20   were all conflicted.

21       Q.   But you never asked them if they were conflicted?

22          MR. ROBERTSON:  Objection to form.  You can

23       answer.

24   BY MR. MURRAY:

25       Q.   You can answer.

1    A.   I think I've already answered this question, but

2  I did ask -- I did ask whether -- what action I should be

3  taking, what advice I should be taking, and the answer I

4  got back was, sorry, we're not going to step into this.

5  You need to figure this out on your own.

6    **Q.   Does CoreRx do any business with Azurity today?**

7    A.   We did an extremely small bit of development work

8  for Azurity -- I believe it was around $5,000 or something

9  to that magnitude -- last year.

10   **Q.   What is Project Eos?**

11   A.   Project Eos?  Project Eos was a carve-out of a

12 manufacturing site that was being contemplated by Azurity.

13   **Q.   Did CoreRx ever propose to manufacture Epaned for**

14 **Azurity?**

15   A.   Not that I recall, no.

16        (Exhibit No. 7 marked for identification.)

17 BY MR. MURRAY:

18   **Q.   The court reporter will hand you what's marked as**

19 **Demani Exhibit 7.**

20        **Have you seen this before?**

21   A.   Yes.

22   **Q.   What is this?**

23   A.   This is an email exchange regarding due diligence

24 items in our evaluation of that carve-out that we're

25 talking about.

1      A.   I don't think I would ever say that because it's

2   not true.

3      Q.   Okay.  Did you ever -- when Azurity filed its

4   patent infringement lawsuit, did you consider fighting it,

5   contesting whether there was a patent infringement?

6      A.   Absolutely.

7      Q.   Bionpharma offered to indemnify you for that,

8   right?

9      A.   That's right.

10      Q.   But you never responded to that offer of

11   indemnification, right?

12           MR. ROBERTSON:  Objection; asked and answered.

13   Go ahead.  Sorry.

14           THE WITNESS:  So as I said, we did.  There was an

15       active negotiation going on with Bion on how we would

16       jointly defend the action that Azurity was taking on

17       us.

18   BY MR. MURRAY:

19      Q.   Why did you ultimately decide not to allow

20   Bionpharma to handle the defense of the patent

21   infringement action on CoreRx's behalf?

22           MR. ROBERTSON:  Objection; asked and answered.

23   Go ahead.

24           THE WITNESS:  Yeah.  So ultimately, this was a

25       business decision.  I looked at the -- essentially, I

 1  looked at the possibility that the patents would hold

 2  and not be invalidated versus the impact of what would

 3  happen if they were, in fact, held and just weighed

 4  pros and cons and ultimately the risk and basically

 5  just made a business decision.

 6        MR. MURRAY:  Okay.  Let's take a break.  I think

 7  I'm pretty much done.  I just want to look at a few

 8  more things.

 9        MR. ROBERTSON:  Great.  Okay.

10        VIDEOGRAPHER:  We're off the video record at

11  3:05.

12        (Recess from 3:06 p.m. until 3:20 p.m.)

13        VIDEOGRAPHER:  We're back on the video record.

14  The time is approximately 3:20 p.m.

15        MR. MURRAY:  I have no further questions.

16        MR. ROBERTSON:  I have no questions.  Mr. Damani,

17  thank you very much.

18        THE WITNESS:  Thank you.

19        VIDEOGRAPHER:  All right.  We're off the video

20  record.  The time is 3:20 p.m.

21        (Deposition concluded at 3:20 p.m.)

22                      -  -  -

23

24

25